*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ASHLEY BRAVO and<br>HELEN BRAVO, as next friend<br>on behalf of ASHLEY BRAVO, | )<br>)<br>) Supreme Court No. S-16914<br>) |
| Appellants, | )<br>) Superior Court No. 4FA-13-02889CI<br>) |
| v. | ) O P I N I O N<br>) |
| SHELBY AKER and FRED AKER, | ) No. **7327** – January 4, 2019<br>) |
| Appellees. | )<br>) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Douglas Blankenship, Judge.

Appearances: Appellants Ashley Bravo and Helen Bravo, pro se, Anchorage. Michael J. Hanson, Call & Hanson, P.C., Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

Plaintiffs/appellants are an adult daughter believed to be incompetent and her mother. After retaining counsel, the mother brought a tort action as the daughter's next friend for *in utero* injuries to the daughter, which the mother alleged were caused almost 20 years previously in a boating accident. The defendants filed a motion for

summary judgment, but they also offered to permit the plaintiffs to dismiss the case with each side to bear its own costs and fees. The plaintiffs' attorney believed that accepting this walk-away offer was in the daughter's best interest, but the mother disagreed. Facing a conflict of interest between his two clients, the attorney moved to withdraw.

The superior court permitted the attorney to withdraw and ultimately granted the unopposed motion for summary judgment and awarded costs and fees against both plaintiffs. The mother and daughter appeal. We hold that before granting the attorney's motion to withdraw the court should have determined the daughter's competency, and if she was found incompetent the court should have appointed a guardian ad litem or taken further action to protect her interests pursuant to Alaska Civil Rule 17(c). We reverse the court's orders granting the motion to withdraw and summary judgment, vacate the award of attorney's fees and costs, and remand.

## II.     FACTS AND PROCEEDINGS

### A.     The Accident And Lawsuit

On May 15, 1993, a boat on the Chena River operated by then-17-year-old Shelby Aker collided with a boat carrying Helen Bravo. Helen was pregnant at the time; Ashley Bravo was born on November 11, 1993.

On November 7, 2013 — four days before Ashley turned 20 and the statute of limitations ran on her personal injury claims — attorney Jeffrey Barber filed a complaint for plaintiffs "Ashley Bravo and Helen Bravo, as next friend on behalf of Ashley Bravo." The Bravos sued Shelby for negligently operating the boat and Fred Aker and John Cooper for negligent entrustment, training, or supervision.[1] The lawsuit alleged that Helen sustained injuries in the boat collision which in turn caused *in utero*

---

[1]     The parties later stipulated to Cooper's dismissal from the case.

injuries to Ashley resulting in cognitive defects. Helen asserted no claims on her own behalf.

## B. The Akers' Summary Judgment Motion

In March 2017 the Akers moved for summary judgment. Based on two expert reports, the Akers argued that Ashley was not harmed by the boating accident. The Akers pointed out that the Bravos had not offered any expert witness testimony that the accident was causally linked to Ashley's condition, and they argued that such expert testimony was necessary to raise a genuine issue of material fact and defeat their summary judgment motion.

The Akers' experts, clinical neuropsychologist Dr. Paul Craig and obstetrician-gynecologist Dr. Sima Kahn, reviewed the medical records of Helen and Ashley. The following facts are taken from Dr. Craig's expert report.[2] Two days after the 1993 accident, Helen stated that she had fallen out of her chair onto the floor of the boat, hitting the back of her head and neck. Three days after the accident, Helen had a prenatal checkup; the only mention in the medical record of the accident seems to be the fact that it occurred.

The Department of Public Safety issued a report five days after the incident. It appears that Helen reported the accident to the Alaska State Troopers on the evening it occurred. In the immediate aftermath of the collision, Helen and those on Shelby's boat confirmed that everyone was "all right" and discussed what had happened. The report states that Helen suffered injuries to her head, back, and ankle. Dr. Craig noted that a sticky note had been attached to a second, lower-quality copy of this report and it read: "Unconscious, fell swallowed water . . . placental abruption." Dr. Craig concluded

---

[2]    We do not mean to imply that these facts have been conclusively established. We recite them only to provide context for this appeal.

that this note had been added later to the original report, and he observed that it was neither signed nor dated, unlike the rest of the report.

Dr. Craig reported that Ashley's birth records mention the boating accident, noting Helen's complaints of back, neck, and shoulder pain. The records state that Helen's pregnancy was "benign," there were neither complications during the birth nor "evidence of fetal distress," and the newborn "appeared to be healthy."

Near Ashley's third birthday, she was deemed "eligible for special education as a student with a handicapping condition." The assessment noted delays in Ashley's mental and physical development and diagnosed her with attention-deficit/hyperactivity disorder (ADHD); the assessment also indicated a family history of ADHD. Dr. Craig also noted that medical and other records throughout Ashley's life repeat the ADHD diagnosis and place her below average on developmental, social, and other cognitive tests.

Dr. Craig reported that Helen had been concerned about harm to Ashley from the start, but there was circumstantial evidence that Helen began embellishing her memory of the incident. The sticky note on the 1993 accident report suggests loss of consciousness, submersion, and placental damage. Dr. Craig himself evaluated Helen in 1997 (he did not recall this when reviewing the case as an expert witness); at that time, Helen reported that she lost consciousness during the accident and was submerged for about five minutes. An accident report Helen filed with the U.S. Coast Guard in 2008 lists injuries including placental abruption. A 2013 neuropsychological evaluation of Ashley was premised entirely on Helen's account of the accident, with no use of primary medical records. For this evaluation, Helen reported that she nearly drowned in the accident, a subsequent ultrasound revealed fetal abnormalities, and there was post-partum evidence of a condition known as "placenta accreta."

Dr. Craig and Dr. Kahn rejected a causal link between the boat collision and Ashley's cognitive deficits. Both emphasized the lack of serious injury or fetal harm mentioned in the contemporaneous records and the unremarkable nature of Ashley's cesarean section birth. Both also noted the possibility that genetic factors contributed to Ashley's ADHD.

## C. Barber's Motion To Withdraw

Shortly before the Bravos' opposition to the summary judgment motion was due, attorney Barber moved to withdraw and requested additional time for the Bravos to oppose. On the court's order, Barber filed an affidavit under seal supporting his motion to withdraw, and another judge reviewed and granted this motion.[3] Barber alluded to "issues of conservator [sic] and guardianship," but his affidavit mostly focused on the breakdown of communication with his clients.

After learning that Helen opposed Barber's motion to withdraw, the original judge presiding over the case held a hearing on the matter.[4] While the court focused on communication problems between the clients and their attorney, Barber made clear there were other concerns:

> There were really three issues, and I tried to address them as best I could in the affidavit. Communication is one of them, and it has certainly gotten worse since the other issues arose, which is issues having to do with guardianship,

---

[3] By order dated August 3, 2018, the superior court unsealed the record in this case for purposes of appellate review.

[4] The time for the Bravos to oppose Barber's motion to withdraw before the reviewing judge had lapsed, but the original judge invited the Bravos to file a motion to reconsider. Barber expressed misgivings about the original judge examining his sealed affidavit, but the Bravos did not share those concerns. Because of this, and believing that it would be more expedient, the original judge elected to rule on Barber's motion to withdraw after receiving the Bravos' written objections.

conservatorship, that I've had concerns about since the get-go. And we appear to be stymied as far as how to proceed in that regard, and I'm not comfortable representing Ashley's interests through Helen. Okay? And I mentioned that in the affidavit that I wrote.

In addition to issues of communication and Ashley's competency, Barber alluded to a "fundamental disagreement" with Helen over prosecuting the case. Yet this conflict was inextricable from the competency issues, as Barber explained:

> THE COURT: What are you talking about? Disagreements about motions, about witnesses, stuff like that?
>
> BARBER: Well, some of it has to do with the underlying, substantive issues in her case: summary judgment issue for one; options, realistic options; likelihoods of prevailing; and what the best options may be to proceed in handling this case and whether it ought to be even tried or not. And then the other one obviously has to do with this guardianship/conservatorship issue, where Helen's capacity in this case is really acting on behalf of her daughter.
>
> THE COURT: With fiduciary duties.
>
> BARBER: Well, there is no conservatorship. If she had a conservatorship and was appointed as guardian for her daughter, then there would certainly be clear fiduciary obligations, and it would be blessed by the court — Helen is proceeding, she's acting on behalf. In the absence of that, I'm Ashley's lawyer — I'm beholden to Ashley, and to the extent that Helen and I don't see eye-to-eye on what should happen in this case and Helen's telling me to do one thing and I'm thinking this is very bad for Ashley . . . I have a huge problem. There's no conservatorship.
>
> THE COURT: Yeah.
>
> BARBER: Ashley is an adult. She's over the age of 18.

THE COURT:  Yeah.

BARBER:  There's not even — there's not a guardianship or a conservatorship.  And these are issues that we have discussed.

THE COURT:  Are you saying — so are you saying there's not a guardianship either?  Is that what you're —

BARBER:  No.

THE COURT:  Okay.  All right.

Barber worried that Helen's approach to the case would end up "very bad for Ashley"; Helen had been "getting away with" speaking for her adult daughter without any legal authority.

The superior court explained general concepts of guardianship and conservatorship to Helen, linking them to the tensions with Barber.  Helen pledged that she would defer to Barber's judgment about prosecuting the case.  The court then ended the ex parte portion of the hearing to coordinate a scheduling conference.

But when the parties reconvened, the court learned that the stalemate between Barber and Helen had continued.  Barber disclosed that the Akers had offered to forgo attorney's fees and costs if the Bravos would dismiss the case.  Despite Barber's insistence that this was the best outcome available to the Bravos, Helen had refused to sign documents accepting the walk-away offer.  At the hearing Barber renewed his request to withdraw.  The court again wrestled with the issue of Ashley's competency and contemplated appointing a guardian ad litem (GAL) for her, but it did not do so.  Instead the court granted Barber's motion to withdraw in a written order and gave the Bravos four weeks to find new counsel or oppose the summary judgment motion representing themselves.

**D. Disposition And Appeal**

The Bravos did not obtain new counsel, but Helen filed motions requesting Barber's reinstatement and more time to oppose summary judgment. The court denied these motions and granted summary judgment without issuing an opinion. The Akers then moved for attorney's fees under Alaska Civil Rule 82. Helen filed various documents trying to resurrect the Akers' walk-away offer, but the court construed these as motions for reconsideration and rejected them as untimely and without merit. The court entered final judgment against Helen and Ashley in the amounts of $3,605.40 in attorney's fees and $1,123.96 in costs.

On appeal the Bravos, representing themselves, charge error to the entirety of the proceedings summarized above.

## III. STANDARD OF REVIEW

We "review de novo issues concerning the interpretation of civil rules, 'adopting the rule of law that is most persuasive in light of precedent, policy and reason.' "[5] "We review a ruling by the superior court allowing an attorney to withdraw under the abuse of discretion standard."[6]

## IV. DISCUSSION

We note as a preliminary matter that the Bravos have styled the caption of their appeal "Ashley Bravo, and Helen Bravo, as next friend on behalf of Ashley Bravo." Because she has no claims of her own, Helen has no role in this case but as Ashley's next friend. If Ashley is competent to represent herself, she does not need a next friend. But as we explain below, a parent acting as an incompetent adult child's next friend cannot

---

[5] *Cooper v. Thompson*, 353 P.3d 782, 786 (Alaska 2015) (quoting *Okagawa v. Yaple*, 234 P.3d 1278, 1280 (Alaska 2010)).

[6] *Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1119 (Alaska 2002).

represent the child without counsel. Thus, the status of these appellants is not entirely clear on the record available to us, but judgment was entered against both of them and their arguments are before us.

The Bravos are self-represented litigants, and their brief does not include the level of analysis one would expect had they been represented by counsel. But certain arguments are evident, and we extend leniency in construing them.[7] In other words, although they do not fully flesh out their arguments in their briefing, we are able to discern the basis of their contentions. They argue the court erred in allowing Barber to withdraw, in granting summary judgment against them, and in awarding attorney's fees and costs against them.

When attorney Barber filed his motion to withdraw, the superior court was immediately faced with a quandary: could the case proceed with an unrepresented and presumedly incompetent plaintiff? Everyone involved — the Bravos, their attorney, and the court — proceeded throughout the case under the apparent assumption that Ashley was incompetent, and the Akers never challenged this assumption in the superior court. Helen brought the suit as next friend on the theory that Ashley, as an incompetent adult, did not have the capacity to bring the action on her own behalf.

Our opinion in *Shields v. Cape Fox Corporation* provides part of the solution to the court's quandary. In *Shields*, a Native village corporation filed suit against the former manager of one of its stores, her teenage daughter, and the manager's brother-in-law for losses at the store.[8] The manager, without counsel, filed an answer on

---

[7]     *Mitchell v. Mitchell*, 370 P.3d 1070, 1083 (Alaska 2016) ("[W]e consider pro se pleadings liberally in an effort to determine what legal claims have been raised." (quoting *Briggs v. City of Palmer*, 333 P.3d 746, 747 (Alaska 2014))).

[8]     42 P.3d 1083, 1085 (Alaska 2002).

her daughter's behalf as her "next friend."[9]  A jury ultimately returned a verdict in favor of the Native village corporation and awarded damages against the three defendants.[10] On appeal, the appellants argued among other things that the judgment against the teenage daughter was void because she was a minor when she was sued and the absence of an attorney or GAL rendered the judgment void.[11]

We held that "Alaska Civil Rule 17(c) governs this issue."[12]  We explained that "[t]he second sentence of this rule makes clear that while a 'next friend' may sue on behalf of a minor, she may not defend a suit against a minor."[13]  Anticipating a case like this one, we also stated that "a next friend cannot generally represent a minor, even as a plaintiff, without counsel."[14]

We cited and discussed several cases from the federal courts of appeal in support of this principle.[15]  In *Johns v. County of San Diego*, the Ninth Circuit reaffirmed

---

[9]      *Id*. at 1086.

[10]     *Id*. at 1085.

[11]     *Id*. at 1086.

[12]     *Id*.  Civil Rule 17(c) provides: "Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person."

[13]     *Shields*, 42 P.3d at 1086.

[14]     *Id*.

[15]     *Id*. at 1086 n.3 (citing *Johns v. Cty. of San Diego*, 114 F.3d 874, 876-77
(continued...)

its prior holding that "a non-lawyer 'has no authority to appear as an attorney for others than himself.' "[16] The Tenth Circuit adopted a similar rule that "a minor child cannot bring suit through a parent acting as next friend if the parent is not represented by an attorney."[17] The Second Circuit provided a rationale for this rule: "The choice to appear *pro se* is not a true choice for minors who . . . cannot determine their own legal actions. . . . It goes without saying that it is not in the interests of minors or incompetents that they be represented by non-attorneys."[18] The Third Circuit adopted this reasoning,[19] and the Ninth Circuit followed suit in *Johns*.[20]

We think it is evident these considerations apply equally to incompetent litigants: Civil Rule 17(c) expressly equates "incompetent persons" with "infants." In

---

[15]     (...continued)
(9th Cir. 1997)). Federal courts have repeatedly dealt with related issues in applying Federal Rule of Civil Procedure 17(c), which mirrors its Alaska counterpart nearly verbatim. *Compare* Alaska R. Civ. P. 17(c) ("Infants or Incompetent Persons"), *with* Fed. R. Civ. P. 17(c) ("Minor or Incompetent Person"). Because of this, we look to federal interpretations to inform our own. *See, e.g.*, *Drickersen v. Drickersen*, 546 P.2d 162, 167 n.9 (Alaska 1976) ("[W]e view federal decisional law construing the Federal Rules of Civil Procedure, and commentary regarding these rules, as relevant authorities for purposes of construing Alaska's Rules of Civil Procedure."); *Burns v. Anchorage Funeral Chapel*, 495 P.2d 70, 72-73 (Alaska 1972) (analyzing Alaska Civil Rule 17 and Federal Civil Rule 17).

[16]     114 F.3d at 877 (quoting *C.E. Pope Equity Tr. v. United States*, 818 F.2d 696, 697 (9th Cir. 1987)).

[17]     *Meeker v. Kercher*, 782 F.2d 153, 154 (10th Cir. 1986).

[18]     *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990) (italics in original).

[19]     *Osei-Afriyie by Osei-Afriyie v. Med Coll. of Pa.*, 937 F.2d 876, 882-83 (3d Cir. 1991).

[20]     114 F.3d at 876.

light of *Shields* and the federal cases cited therein, the superior court in this case should have recognized that if the Bravos' lawyer was permitted to withdraw, Ashley — a presumed incompetent person — could not be represented by her mother. But could Ashley represent herself?

The answer is no. Incompetent persons cannot represent themselves in court; they must bring and defend actions through a competent adult.[21] However, "the general rule is that the next friend must retain counsel."[22] This is also the rule in *Shields*.[23]

So what was the superior court to do? If there was any substantial question about Ashley's competence, the court should have ordered a competency examination and conducted a competency hearing.[24] If the court found that Ashley was competent, then she could proceed as plaintiff representing herself, and the court's quandary (at least as to the existential question whether the litigation could proceed if Barber withdrew) would be resolved.

On the other hand, if there was a finding that Ashley was not competent — or if the court determined to continue under the assumption, apparently shared by all, that Ashley was not competent — what should the court have done? The answer is found, again, in Civil Rule 17(c)'s final sentence: "The court shall appoint a guardian ad litem

---

[21]     1 STEVEN S. GENSLER, Rule 17, FED. RULES OF CIV. PROC., RULES AND COMMENT. 470-71 (2018).

[22]     *Id*. at 471.

[23]     *Shields v. Cape Fox Corp.*, 42 P.3d 1083, 1086 (Alaska 2002).

[24]     *Allen v. Calderon*, 408 F.3d 1150, 1153 (9th Cir. 2005) ("[W]hen a substantial question exists regarding the mental competence of a party proceeding pro se, the proper procedure is for the district court to conduct a hearing to determine competence, so a guardian ad litem can be appointed, if necessary.").

for an . . . incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the . . . incompetent person."[25] The court is to exercise its discretion in accommodating the incompetent person's needs.[26]

Additionally, a GAL — or the court on its own pursuant to Rule 17(c)'s final sentence — could have initiated the process of appointing a long-term guardian or conservator for Ashley. The court has many tools available to solve such a quandary. Unfortunately, the superior court missed an opportunity to use those tools, as shown in this colloquy:

> THE COURT: And then with Ashley we've got the issue about competency. Is that an accurate way to describe it, Mr. Barber?
>
> BARBER: Yes.
>
> THE COURT: And the issue about, there's no guardian, no conservator. One thing to do is, as I sit here, I'm not sure a guardian ad litem — whether there's authority to appoint [the Office of Public Advocacy] as a guardian ad litem here in a case like this. But that would be one thing that we can do, and I think that would help alleviate the concerns that Mr. Barber has.

But no GAL was appointed. Upon granting Barber's motion to withdraw, the superior court was left with a civil action where the plaintiff could not represent herself and had no GAL or other proper representative. Under this circumstance, the court could not,

---

[25] The Ninth Circuit has explained that Rule 17(c) directs courts to protect incompetent parties. *See, e.g., Davis v. Walker*, 745 F.3d 1303, 1310 (9th Cir. 2014). However, Rule 17(c) does not require courts to appoint a GAL for every party who lacks capacity. GENSLER, *supra* note 21, at 472-73.

[26] *See* GENSLER, *supra* note 21, at 472; *see also Johnson v. Johnson*, 544 P.2d 65, 74 (Alaska 1975) ("The determination of the need for a guardian ad litem is left within the sound discretion of the trial judge.").

consistent with its duty to "protect the . . . incompetent person," rule on the defendants' summary judgment motion or award fees and costs against the incompetent person. It was error to do so.

Barber's motion to withdraw as counsel was based, in part, on "communication" issues and a "fundamental disagreement" over litigation strategy. Barber faced a genuine conflict of interest between his two clients, and under ordinary circumstances withdrawal would have been appropriate. But these were not ordinary circumstances due to the third basis for Barber's motion: unresolved questions about Ashley's competency and her mother's ability to represent her. We conclude it was an abuse of discretion to grant Barber's motion to withdraw without first resolving the threshold question of Ashley's competency and considering the need for a GAL to represent her.

## V.    CONCLUSION

We REVERSE the superior court's orders granting the attorney's motion to withdraw and granting summary judgment. We VACATE the award of attorney's fees and costs. We REMAND the case to its *status quo ante* the order granting the attorney's motion to withdraw. On remand the superior court shall conduct further proceedings consistent with this opinion.